UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

COMPLIANT PHARMACY ALLIANCE
COOPERATIVE,

                Plaintiff,

     v.

AMERISOURCEBERGEN DRUG CORPORATION
and AMERISOURCEBERGEN CORPORATION,

             Defendants.

CASE NO. 18-CV-580

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

PROCEDURAL HISTORY....................................................................................4

FACTUAL BACKGROUD....................................................................................5

    A.  The Structure of the CPA Partnership ........................................................5

    B.  BluePoint and the 2016 CPA Agreement ..................................................9

    C.  BluePoint Pricing ....................................................................................11

    D.  Ongoing Negotiations .............................................................................11

    E.  WBAD Value...........................................................................................14

LEGAL STANDARD...........................................................................................15

ARGUMENT ......................................................................................................16

    I.       CPA HAS STANDING TO SEEK DAMAGES ON BEHALF OF ITS MEMBERS......................16

    II.      CPA'S CLAIM FOR BREACH OF CONTRACT PURSUANT TO THE IMPLIED
              COVENANT OF GOOD FAITH AND FAIR DEALING IS WELL-PLEADED...........................17

    III.    CPA'S CLAIM FOR FRAUDULENT INDUCEMENT IS WELL-PLEADED............................26

         A.  CPA's Fraudulent Inducement Claim Is Not Barred Under Principles of
            Pennsylvania Law .................................................................................26

            1.  The Parol Evidence Rule Does Not Bar CPA's Claim ...................................26

            2.  The Gist of the Action Doctrine Does Not Bar CPA's Claim ........................29

            3.  The Economic Loss Doctrine Does Not Bar CPA's Claim ............................31

         B.  CPA'S Fraudulent Inducement Claim Satisfies Federal Rule
            of Civil Procedure 9(b) .........................................................................32

    IV.    CPA'S CLAIM UNDER RICO IS WELL-PLEADED ...............................................34

         A.  CPA Sufficiently Pleads a Distinct RICO Enterprise ...........................................36

    B.  CPA Sufficiently Pleads a "Pattern" of Racketeering Activity ............................38

    C.  CPA Sufficiently Pleads Predicate Acts of Mail and Wire Fraud ........................41

        1.  CPA Alleges Mail and Wire Fraud with Sufficient Specificity......................42

        2.  CPA's Allegations of Racketeering Activity Are Not Duplicative
           of Its Breach of Contract Claim ................................................................45

    D.  CPA's RICO Claim Is Not Time-Barred ..............................................................47

    E.  CPA's RICO Claim Applies to ABC with Equal Force .........................................49

V.    CPA'S CLAIM FOR BREACH OF CONTRACT UNDER SECTION 7(C)(6) OF THE
    2016 CPA AGREEMENT IS WELL-PLEADED.................................................................50

CONCLUSION...............................................................................................................................51

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                               **Page(s)**

*1726 Cherry St. P'ship by 1726 Cherry St. Corp. v. Bell Atl. Properties, Inc.,*
   439 Pa. Super. 141 (1995)...................................................................................... 28

*Arenson v. Whitehall Convalescent & Nursing Home, Inc.,*
   880 F. Supp. 1202 (N.D. Ill. 1995) .................................................. 34, 39, 41, 42, 43

*Betz Labs., Inc. v. Hines,*
   647 F.2d 402 (3d Cir. 1981)..................................................................................... 26

*Bridge v. Phoenix Bond & Indem. Co.,*
   553 U.S. 639 (2008) ................................................................................................. 43

*Brown v. Access Midstream Partners, L.P.,*
   141 F. Supp. 3d 323 (M.D. Pa. 2015) ................................................................ 45, 46

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP,*
   329 F.3d 923 (7th Cir. 2003)................................................................................... 38

*Castellanos v. Worldwide Distribution Sys. USA, LLC,*
   290 F. Supp. 3d 692 (E.D. Mich. 2017).................................................................. 45

*Cedric Kushner Promotions, Ltd. v. King,*
   533 U.S. 158 (2001) ................................................................................................. 36

*Clairton Slag, Inc. v. Dep't of Gen. Servs.,*
   2 A.3d 765 (Pa. Commw. Ct. 2010) ........................................................................ 51

*CoreStates Leasing Inc. v. Housewright,*
   No. 96-CV-8678, 1998 WL 151028 (E.D. Pa. Mar. 31, 1998)................................. 27

*Curley v. Allstate Ins. Co.,*
   289 F. Supp. 2d 614 (E.D. Pa. 2003) ...................................................................... 18

*E. Roofing Sys., Inc. v. Cestone,*
   No. 08 CV 8764, 2012 WL 6051097 (Pa. Com. Pl. Apr. 13, 2012) ........................ 29

*Eike v. Allergan, Inc.,*
   850 F.3d 315 (7th Cir. 2017)................................................................................... 24

*Emery v. American General Finance Inc.*,
    134 F.3d 1321 (7th Cir. 1998) ............................................................ 38

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
    No. 14-CV-748-WMC, 2015 WL 7301245 (W.D. Wis. Nov. 18, 2015) .................................. 33

*eToll, Inc. v. Elias/Savion Advertising, Inc.*,
    811 A.2d 10 (Pa. Super. Ct. 2002) ............................................................ 30

*Fed. Ins. Co. v. Parello*,
    767 F. Supp. 157 (N.D. Ill. 1991) ............................................................ 17

*Fed. Reserve Bank of San Francisco v. HK Sys., Inc.*,
    No. C-95-1190 MHP, 1997 WL 765952 (N.D. Cal. Nov. 12, 1997) .................................. 36

*Fluid Power, Inc. v. Vickers, Inc.*,
    No. 92-CV-0302, 1993 WL 23854 (E.D. Pa. Jan. 28, 1993) .................................. 21

*Fujisawa Pharm. Co. v. Kapoor*,
    814 F. Supp. 720 (N.D. Ill. 1993) ............................................................ 42

*GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*,
    64 F.3d 1112 (7th Cir.1995) ............................................................ 16

*Gauder v. Leckrone*,
    366 F. Supp. 2d 780 (W.D. Wis. 2005) ............................................................ 16

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ............................................................ 38, 39

*Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*,
    747 F.2d 384 (7th Cir. 1984) ............................................................ 42, 43

*Harris v. Wells*,
    757 F.Supp. 171 (D. Conn. 1991) ............................................................ 43

*Hart v. Arnold*,
    884 A.2d 316 (Pa. Super. Ct. 2005) ............................................................ 30

*HCB Contractors v. Liberty Place Hotel Assocs.*,
539 Pa. 395 (1995) ....................................................................................................... 28

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ....................................................................................................... 16

*Honey Creek Stone Co. v. Telsmith, Inc.*,
No. 03-C.A.-11347, 2009 WL 6371627 (Pa. Com. Pl. Dec. 31, 2009) ................................... 31

*HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc.*,
590 F. Supp. 2d 677 (D.N.J. 2008) ............................................................... 39, 40, 41

*In re Cardiac Devices Qui Tam Litig.*,
221 F.R.D. 318 (D. Conn. 2004) .................................................................................... 42

*In re ClassicStar Mare Lease Litig.*,
727 F.3d 473 (6th Cir. 2013) ........................................................................................ 36

*In re Copper Antitrust Litigation*,
436 F.3d 782 (7th Cir. 2006) ........................................................................................ 48

*In re Mastercard International Inc.*,
313 F.3d 257 (5th Cir. 2002) ........................................................................................ 43

*In re U.S. Foodservice Inc. Pricing Litig.*,
No. 06-CV-1657, 2009 WL 5064468, (D. Conn. Dec. 15, 2009) ..................................... *passim*

*Interwave Tech., Inc. v. Rockwell Automation, Inc.*,
No. 05-CV-398, 2005 WL 3605272 (E.D. Pa. Dec. 30, 2005) ................................................ 18

*Jackson v. Wells Fargo Bank, N.A.*,
No. 12-CV-1262, 2013 WL 5945732 (W.D. Pa. Nov. 6, 2013) ......................................... 18, 19

*Jeter v. Wild W. Gas, LLC*,
No. 12-CV-411-TCK-PJC, 2015 WL 5970992 (N.D. Okla. Oct. 14, 2015) ............................ 45

*John B. Conomos, Inc. v. Sun Co. (R&M)*,
831 A.2d 696 (Pa. Super. Ct. 2003) ................................................................................. 18, 24

*Lorenz v. CSX Corp.*,
　1 F.3d 1406 (3d Cir. 1993) ................................................................. 36

*LSI Title Agency, Inc. v. Evaluation Servs., Inc.*,
　951 A.2d 384 (Pa. Super Ct. 2008) ..................................................... 25

*M.W. Widoff, P.C. v. Encompass Ins. Co. of Am.*,
　No. 10 C,8159, 2012 WL 769727 (N.D. Ill. Mar. 2, 2012) .................... 16

*Martinez v. Calimlim*,
　651 F. Supp. 2d 852 (E.D. Wis. 2009) ................................................ 39

*Martrano v. Quizno's Franchise Co.*,
　No. 08-CV-0932, 2009 WL 1704469 (W.D. Pa. June 15, 2009) ...................................... *passim*

*McCool v. Strata Oil Co.*,
　972 F.2d 1452 (7th Cir. 1992) ............................................................ 47

*McCullough v. Suter*,
　757 F.2d 142 (7th Cir. 1985) .............................................................. 36

*Montanez v. HSBC Mortg. Corp. (USA)*,
　876 F. Supp. 2d 504 (E.D. Pa. 2012) ............................................ 18, 19

*N. Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*,
　163 F.3d 449 (7th Cir. 1998) .............................................................. 15

*Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*,
　No. 92 C,6089, 1993 WL 360426, n.4 (N.D. Ill. Sept. 15, 1993) ........... 26

*Philadelphia TMC, Inc. v. AT & T Info. Sys., Inc.*,
　651 F. Supp. 169 (E.D. Pa. 1986) ....................................................... 37

*Ploog v. HomeSide Lending, Inc.*,
　209 F. Supp. 2d 863 (N.D. Ill. 2002) .................................................. 17

*Polymer Dynamics, Inc. v. Bayer Corp.*,
　No. 99-CV-4040, 2000 WL 1146622 (E.D. Pa. Aug. 14, 2000) .............. 36

*Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*,
    727 F.3d 646 (7th Cir. 2013)..................................................................... 25

*Pride Mobility Prod. Corp. v. Comfort Med. Supply, LLC*,
    No. 3:13-CV-452, 2013 WL 2371215 (M.D. Pa. May 30, 2013)........................ 26

*Raucci v. Candy & Toy Factory*,
    145 F. Supp. 3d 440 (E.D. Pa. 2015) ......................................................... 16

*Reardon v. Allegheny Coll.*,
    926 A.2d 477 (Pa. Super. Ct. 2007) .......................................................... 30

*Reilly Foam Corp. v. Rubbermaid Corp.*,
    206 F. Supp. 2d 643 (E.D. Pa. 2002) ......................................................... 31

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) .......................................................... 36, 49, 50

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*,
    84 F.3d 629 (2d Cir.1996)..................................................... 41, 45

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ............................................................................... 34

*Sheinman Provisions, Inc. v. Nat'l Deli, LLC*,
    No. CIV. A. 08-CV-453, 2008 WL 2758029 (E.D. Pa. July 15, 2008) .................. 25

*Singh v. Marks*,
    No. 14-CV-507-JDP, 2016 WL 5409629 (W.D. Wis. Sept. 28, 2016)................... 15

*Somers v. Somers*,
    613 A.2d 1211 (Pa. Super. Ct. 1992) ......................................................... 19

*Suessenbach Family Ltd. P'ship v. Access Midstream Partners, L.P.*,
    No. CIV.A. 3:14-1197, 2015 WL 1470863 (M.D. Pa. Mar. 31, 2015)................... 45

*Sullivan v. Chartwell Inv. Partners, LP*,
    873 A.2d 710 (Pa. Super. Ct. 2005) .......................................................... 29

*Tabas v. Tabas*,
  47 F.3d 1280 (3d Cir. 1995) ............................................................................ 39, 40

*Techinomics, Inc. v. Forest Power & Energy Holding, Inc.*,
  No. 17-CV-1859, 2017 WL 2536969 (W.D. Pa. May 11, 2017) ........................... 27, 28, 29, 30

*Temple Univ. Hosp., Inc. v. Grp. Health, Inc.*,
  2006 WL 146300 (E.D. Pa. Jan. 12, 2006) ............................................................ 21

*Tiesinga v. Dianon Sys., Inc.*,
  231 F.R.D. 122 (D. Conn. 2005) .......................................................................... 42

*U.S. Bank, Nat. Ass'n v. Cromeans*,
  No. 11-CV-546, 2011 WL 5903941 (S.D. Ill. Nov. 22, 2011) .............................. 17

*U.S. Small Bus. Admin v. Progress Bank*,
  No. 03-CV-3461, 2004 WL 2980412 (E.D. Pa. Dec. 22, 2004) ............................ 31

*United States v. Paneras*,
  222 F.3d 406 (7th Cir. 2000) .............................................................................. 41

*USX Corp. v. Prime Leasing Inc.*,
  988 F.2d 433 (3d Cir. 1993) ............................................................................ 24, 25

*Vanhuss v. Kohn Law Firm S.C.*,
  127 F. Supp. 3d 980 (W.D. Wis. 2015) ........................................................ 15, 16, 33

*Vicon Fiber Optics Corp. v. Scrivo*,
  201 F. Supp. 2d 216 (S.D.N.Y. 2002) ................................................................. 43

*Vives v. Rodriguez*,
  849 F. Supp. 2d 507 (E.D. Pa. 2012) ................................................................. 30

*Walls v. Vre Chicago Eleven, LLC*,
  No. 16-CV-4048, 2016 WL 5477554 (N.D. Ill. Sept. 29, 2016) ......................... 32, 34

*Werwinski v. Ford Motor Co.*,
  286 F.3d 66 (3d Cir. 2002) ................................................................................. 31

*Whitley v. Taylor Bean & Whitacker Mortg. Corp.*,
   607 F. Supp. 2d 885 (N.D. Ill. 2009) ........................................................ 32

*Williams Elecs. Games, Inc. v. Barry*,
   42 F. Supp. 2d 785 (N.D. Ill. 1999) ......................................................... 39

**Statutes**

18 U.S.C. § 1341 ....................................................................................... 41
18 U.S.C. § 1343 ....................................................................................... 41
18 U.S.C. § 1961(1) ............................................................................. 35, 41
18 U.S.C. § 1961(4) ................................................................................... 36
18 U.S.C. § 1962(c) ............................................................................. 34, 36
18 U.S.C. § 1961(5) ............................................................................. 35, 39

**Rules**

Federal Rule of Civil Procedure 9(b) .................................................. *passim*

**Other Authorities**

Restatement (Second) of Contracts § 205 (1979) ....................................... 18

Plaintiff Compliant Pharmacy Alliance Cooperative ("CPA") submits this memorandum of law in opposition to Defendants AmerisourceBergen Drug Corporation's ("ABDC") and AmerisourceBergen Corporation's ("ABC," and together with ABDC, "Amerisource" or "Defendants") motion for judgment on the pleadings.  CPA is a member-owned pharmaceutical buying cooperative that leverages its prescription purchasing volume and compliance to provide cost savings to the 1700+ independent businesses it represents.  ABC is among the largest wholesale drug distributors in the United States, and ABDC is a wholly-owned ABC subsidiary through which ABC operates its pharmaceutical distribution business.  Pursuant to the parties' distributorship agreement, ABDC functions as CPA's primary generics distributor.

## PRELIMINARY STATEMENT

This litigation arose when CPA discovered that ABDC and ABC repeatedly and artificially inflated the prices of certain products supplied by ABC's wholly-owned subsidiary BluePoint Laboratories ("BluePoint"), an entity incorporated in Ireland.  After years of enjoying a mutually beneficial partnership dating back to 2009, Defendants turned the parties' relationship on its head in 2013 when Defendants began incorporating BluePoint products into the mix of products sold to CPA through the partnership program.  Defendants represented to CPA that, despite ABC's ownership of BluePoint, they would keep the prices of BluePoint products competitive.  But over time, CPA discovered that Defendants were in fact doing the opposite; they were inflating BluePoint prices and gouging CPA and its members.

The complaint categorically pleads that Defendants did not negotiate pricing at arms-length with their affiliate and subsidiary BluePoint, and thus violated their contractual obligations to the substantial monetary detriment of CPA.  Neither in their answer filed back in September nor in their present motion do Defendants dispute that the pricing of BluePoint products under the

1

program—even after taking account of various discounts and rebates available under the program—is totally out of line with pricing available on the open market, and is in many cases higher than pre-rebate invoice prices available to CPA competitors.  Nor could they, because CPA's claims are based on objective and uncontroverted pricing data which establish a massive pricing differential between ABDC's pricing of Blue Point and competitive market pricing (which data will be further supplemented with information acquired through discovery).  This conduct, if proven, at the very least creates a question of fact for a jury regarding whether ABDC breached the implied covenant of good faith and fair dealing.

In an effort to deflect attention away from their inability to contest this dispositive issue, Defendants instead choose to argue that a separately negotiated ███████████ provision in the 2016 agreement between the parties somehow absolves ABDC of any duty to negotiate pricing fairly on CPA's behalf.  This argument is factually inaccurate and legally irrelevant.

*First*, this argument does not in any way address CPA's damages claims from 2013 to 2016 when the parties operated under the 2009 agreement, ██████████████████████████ ██████████████.  Indeed, the inclusion of ███████████████ in the 2016 agreement is an admission that BluePoint pricing was improper from 2013 through 2016.

*Second*, with respect to CPA's claim for damages from 2016 to the present, this point is factually irrelevant because ███████████ has nothing to do with whether or not ABDC has a duty to negotiate at arms-length on CPA's behalf, such that CPA would receive market-competitive pricing for products supplied by ABC's wholly-owned subsidiary.  And ████████ is legally irrelevant because it does not "expressly" govern the underlying pricing terms for BluePoint products.  The case law clearly establishes that when a party takes on a contractual duty to negotiate a term such as pricing, it must do so in a fair way, and the fact that a related or

connected term may go into a calculation does not relieve it of that underlying obligation.  Here, the parties' contract defines payments to suppliers like BluePoint simply as ███████████████ ███████ to such suppliers.  CPA contends the implied covenant requires that those costs necessarily be negotiated in good faith.

As explained in greater detail below, the provisions upon which ABDC relies establish only a floor ████████████████████████████████████ to ensure a minimum level of performance by ABDC.  These provisions were intended to benefit CPA, not Defendants.  They do not absolve ABDC of its well-established contractual duty to act in good faith on CPA's behalf.  They do not authorize Defendants to refrain from negotiating with their affiliate.  And they certainly do not permit Defendants to expatriate profits overseas under Ireland's favorable tax laws to CPA's detriment.

Consistent with this understanding ████████████████████████████████████, Amerisource personnel repeatedly promised CPA during the negotiations leading to the parties' 2016 agreement that they would do exactly what they are contractually obligated to do: negotiate with BluePoint on CPA's behalf to secure competitive pricing.  However, once that contract was executed, ABDC immediately began to breach the parties' new agreement.  In fact, BluePoint ████████████████████████ actually *worsened*.  ABDC is more than happy to pay the ████ ████████████████ *out of its own pocket* because Defendants calculate—accurately—that they will come out ahead ██████████████████████████████ compared to the alternative of actually negotiating BluePoint prices down to competitive levels.  But that calculation completely violates the spirit of the parties' agreement: ██████████████████ was intended to provide CPA some degree of comfort with respect to what it was misled to believe were high but negotiated costs—not to absolve ABDC of its underlying duty to negotiate with

3

BluePoint in good faith.  Defendants should not be permitted to misuse the ███████████ provision to advantage themselves at CPA's expense.

For all the foregoing reasons, and those explained in greater detail below, the Court should permit CPA's well-pleaded claims for breach of contract pursuant to the implied covenant of good faith and fair dealing, fraudulent inducement, RICO, and express breach of contract to proceed to discovery.

## PROCEDURAL HISTORY

From the beginning, Defendants have engaged in a campaign of delay.  By January 2018, CPA began engaging in business-to-business discussions raising its concerns regarding BluePoint pricing with Defendants.  In April 2018, CPA's attorneys sent a demand letter to Defendants notifying them of their claims.  CPA then engaged Defendants for months and answered all of Defendants' requests for additional information concerning CPA's allegations and damages.  Indeed, CPA went so far as to provide Defendants with a draft complaint as well as citations to numerous cases providing the legal bases for its claims.  After stringing CPA along for months, Defendants conclusorily declared CPA's claims meritless and threatened sanctions against CPA's counsel.

Since the negotiations did not resolve the dispute, CPA initiated litigation on July 24, 2018, in this Court.  At that point, Defendants immediately requested a 30 day extension on its time to answer; on the assumption that Defendants would file a detailed motion to dismiss, CPA ultimately agreed to a 2 ½ week extension, providing Defendants six weeks to prepare their response.  But at the end of that period, instead of filing a motion to dismiss the complaint that Defendants had repeatedly characterized as meritless, Defendants chose to file an answer— in which it failed to even argue that BluePoint pricing to CPA is market competitive—prompting the Court to hold a

pretrial conference on October 12, 2018.   At that conference, the Court entered a pretrial scheduling order setting, *inter alia*, September 30, 2019 as the deadline for dispositive motions; January 24, 2020 as the deadline for discovery; and the trial date as March 9, 2020.   At the conference, Defendants did not request a stay of discovery or state that they intended to file a motion for judgment on the pleadings.

With discovery underway, CPA served its First Sets of Requests for Production of Documents and Interrogatories on October 26, 2018.   On November 26, 2018, Defendants responded to CPA's First Sets of Requests for Production of Documents and Interrogatories with across-the-board boilerplate objections.   To date, Defendants have not served any discovery requests.   Instead, on November 16, 2018, four months after this case began and with discovery underway, Defendants filed the present motion seeking the very same relief they could have sought months ago in a motion to dismiss.   Most recently, Defendants filed a motion to stay discovery pending decision on their motion for judgment on the pleadings on November 26, 2018, the very same day Defendants' discovery responses were due.   Defendants have used the pendency of their motion for stay as a basis to refuse to engage in discovery.   The reason for Defendants' delay is transparent.

## FACTUAL BACKGROUND

### A.  The  Structure of the CPA Partnership

In 2009, CPA entered into a cooperative purchasing agreement with ABDC (the "2009 CPA Agreement").   Amended Complaint ¶ 32.  Following a series of amendments and extensions to the 2009 CPA Agreement, the parties entered into a new ███████ agreement that retained the same basic economic structure with improved economics and incentives based on historical performance of CPA, the unprecedented length of the term, and future growth projections of CPA

(the "2016 CPA Agreement"). *See* Exhibit A, 2016 CPA Agreement. The Agreements (including the amendments and extensions thereto) were intended to provide CPA a means of acquiring generic drugs at competitive net prices through a partnership with ABDC known as the CPA PRxO Generics Partnership Program (the "CPA Partnership"). Amended Complaint ¶¶ 1, 34, 36. 39. As amended in 2013, the 2009 CPA Agreement specifically recognized that ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ ABDC explicitly promised CPA ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

    Moreover, concerning BluePoint products in particular, ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ ████████████████

██████████████████ Likewise, the 2016 CPA agreement provides that █████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████   ████████████

████████████████████████

The CPA Agreement also ██████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

     ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

     █   ██  ██  ███  ███  ██  ████  ████  ████  ███  █

        ████████████████████████████████████████

     █  ████████████████████████████████████████

        ████████████████████████████████████████

        ████████████████████████████████████████

        ████████████████████████

     █  ████████████████████████████████████████

        ████████████████████████████████████████

        ████████████████████████████████████████

        ████████████████████████████████████████

        ████████████████████████████████████████

---

[1] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

█ ███████████████████████████████████████████████

██ ████ ██████ ████ █████ █ █████ █████ █████ ███ ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████

█ ███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

█ ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

Pharmacy-distributor agreements typically provide for discounts to pharmacies in the form

of rebates. █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ ██████

████████████████████████████████████████████████ CPA ultimately provides any discounts ███████████████ to its members in the form of rebates based on their specific purchases under the CPA Partnership.  Amended Complaint ¶ 35(4).

From 2009 to 2013, the CPA Partnership was a success.  █████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ As such, CPA was able to pass on the significant savings to its members.  Amended Complaint ¶ 37.  In early 2013, the parties ████████ ████████████████████████████ through a "First Amendment to Cooperative Purchasing Agreement."  In light of the CPA Partnership's success, the core components and intent of the program remained unchanged.  Amended Complaint ¶ 38.

### B.  BluePoint and the 2016 CPA Agreement

In late 2012, ABC formed BluePoint, a wholly-owned subsidiary located in Cork, Ireland. A few months later, in 2013, ABDC began to include BluePoint generic product lines in the CPA Partnership.  Amended Complaint ¶ 40.  From their introduction into the CPA Program, BluePoint generic products have been treated identically ████████████████████████████ ████████████████████████████ Amended Complaint ¶ 41.

In the fall of 2015, the parties began to negotiate a new CPA Agreement for reasons initially unrelated to BluePoint.  Amended Complaint ¶ 43.  During those negotiations, CPA discovered █████████████████████████████████████████████ for BluePoint products from 2013-2015 was significantly lower than that of the other products' offered under the CPA Partnership.  Amended Complaint ¶ 42.  Upon making this discovery, CPA confronted Defendants about the unusually high and non-competitive prices of BluePoint products in the CPA Partnership ██████████████████████████████.  Amended Complaint ¶ 43.  In

9

response, Defendants represented orally and in written correspondence that they would continue to negotiate with BluePoint on CPA's behalf in the exact same fashion that it does with respect to all other products under the CPA Partnership.   Amended Comlaint ¶ 44.   Defendants further represented that going forward, they would ensure that all BluePoint products sold under the CPA Partnership would have competitive ████████████████ in-line with the overall market.   In reliance on these representations, CPA agreed to the new 2016 CPA Agreement, including new BluePoint terms, in January 2016.  Amended Complaint ¶ 44.

In addition to extending the term of the CPA Partnership, the 2016 CPA Agreement added another provision in favor of CPA in response to CPA's concerns about the above-mentioned disparity in BluePoint performance at that time.  Amended Complaint ¶ 45.  Under the terms of the new provision, ███████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████

Based on Defendants repeated representations that they would competitively manage BluePoint product lines and its purported rationale for creating its own generic manufacturing label (which was to gain additional savings from the actual finished goods manufacturer through lower final costs), CPA's expectation was that BluePoint products would independently exceed the portfolio ███████████████████████████████████████████
██████████████.  Amended Complaint ¶ 46.  ████████████████████████████
██████████████████████████████████████ Amended Complaint ¶ 46.

### C.  BluePoint Pricing

Each of Defendants' foregoing representations concerning the management of BluePoint product pricing under the 2016 CPA Agreement has turned out to be false.  Since the parties entered into the 2016 CPA Agreement, Defendants have continued their scheme to artificially inflate ██████████████████████████ BluePoint products.  Amended Complaint ¶ 47.  As a result, the pricing on BluePoint products has fallen significantly behind the competitive levels of similar generic equivalent items in the market.  Amended Complaint ¶ 47.  The cost is significant:  in terms of dollars, BluePoint products make up approximately ██% of CPA member purchases under the partnership program.  CPA Answer to Amended Counterclaim ¶ 83.  Indeed, in **every quarter** since the 2016 CPA Agreement went into effect, BluePoint products have fallen far short of independently achieving ██████████████████████.  Amended Complaint ¶ 48.  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████ █ ████████████████████████████

████████████████████████████████████████

████████████████████████████  ██████████

████████████████████████████████

### D.  Ongoing Negotiations

Since the summer of 2017, CPA has repeatedly confronted Defendants about the non-competitive pricing ██████████████████████ of BluePoint products and the significant harm this clear breach of the 2016 CPA Agreement is causing CPA.  Amended Complaint ¶ 61.  The parties have had multiple in-person meetings in Philadelphia during which

Defendants have renewed their representations that they would negotiate, at arms-length, with ABC's subsidiary to ensure competitive pricing on BluePoint products. Amended Complaint ¶ 62. For example, Kurt Ginter (Vice President, Community & Specialty Pharmacy Finance) represented to CPA on March 20, 2018, that Ernst & Young had advised that ABDC cannot influence BluePoint pricing without running into tax issues. ABDC also represented that it was using competitive invoice data provided by CPA to negotiate lower costs with BluePoint. Amended Complaint ¶ 62. Despite these representations, ███████████████████████ ██████████████████████ BluePoint products under the CPA Partnership have not improved and remained significantly below competitive levels. Amended Complaint ¶¶ 52-55, 62.

In December 2017, despite all of its specific representations leading up to the execution of the 2016 CPA Agreement, Defendants offered to improve their management of BluePoint pricing going forward, but only if CPA agreed █████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████. Amended Complaint ¶ 63. Remarkably, within three days of that proposal, Defendants provided a list containing █████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ *See* Exhibit D, 12/22/2017 BluePoint Price List. Defendants' stunning proposal provides indisputable evidence of their calculated scheme to artificially inflate BluePoint pricing and demonstrates that all along Defendants have been in sole control of BluePoint's ███████████████████ ████████████████████ Amended Complaint ¶ 64. CPA did not agree to Defendants' proposal, however, because it included offsetting economics that would have

essentially voided any benefit to CPA. Amended Complaint ¶ 65. An ABC representative, Robert Mauch, acknowledged this very fact when he and others admitted in these meetings that Defendants' December 2017 proposal was "about optics, not economics"—*i.e.*, that the changes would not actually benefit CPA. Amended Complaint ¶ 65. CPA therefore rejected Defendants' offer. Amended Complaint ¶ 65.

On March 8, 2018, during the course of renewed negotiations, Rich Tremonte, ABC's President of Strategic Global Sourcing, admitted to Jay Blackburn, CPA's CEO, that Defendants have manipulated the pricing of BluePoint products under the CPA Program. Amended Complaint ¶ 66. Specifically, Tremonte represented that ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███. Amended Complaint ¶ 66. During early spring 2018 calls with Amerisource staff including Rich Tremonte, Kurt Ginter, Michael Nachman, and Justin Eisenhart, it has become clear that Defendants have artificially controlled ███████████████████████████

███████████████ BluePoint products since 2013. Specifically, during a call on April 9, Mr. Tremonte referred to BluePoint product pricing as "bullshit pricing." Amended Complaint ¶ 66.

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████ ████████████████ ██████████████████████

███████████████████████████████████████████████████████

████████████████

**E.  WBAD Value**

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

Around March 2018, ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████, Defendants simultaneously advised CPA that ██

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

14

███████████████████████████████████████████████. Amended

Complaint ¶¶ 72-73.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████    ██████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████    ██████████████████████████████████

█████████████████████████████████████████████████████

████████

On numerous occasions over the past several months, CPA has repeatedly requested

information from Defendants regarding the alleged shift ██████████████. Amended Complaint ¶

76. Defendants have denied these requests on the ground that CPA is not contractually entitled to

that information. Amended Complaint ¶ 76.

## LEGAL STANDARD

"Motions for judgment on the pleadings under Rule 12(c) are reviewed under the same

standard as motions to dismiss under Rule 12(b)." *Singh v. Marks*, No. 14-CV-507-JDP, 2016 WL

5409629, at *1 (W.D. Wis. Sept. 28, 2016) (citing *N. Indiana Gun & Outdoor Shows, Inc. v. City

of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998)). "Like Rule 12(b) motions, courts grant

a Rule 12(c) motion only if it appears beyond doubt that the plaintiff cannot prove any facts that

would support his claim for relief." *Vanhuss v. Kohn Law Firm S.C.*, 127 F. Supp. 3d 980, 985 (W.D. Wis. 2015) (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 452 (7th Cir. 1998)).  *See also Gauder v. Leckrone*, 366 F. Supp. 2d 780, 785 (W.D. Wis. 2005) ("a claim will not be dismissed unless 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'") (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)).  "Thus to succeed, the moving party must demonstrate that there are no material issues of fact to be resolved." *Vanhuss,* 127 F. Supp. 3d at 985.  "Just as with a summary judgment motion, the court also views the facts in the complaint in the light most favorable to the non-moving party" on a motion for judgment on the pleadings.  *Id.* (citing *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.,* 64 F.3d 1112, 1114 (7th Cir.1995)).

## ARGUMENT

### I.    CPA HAS STANDING TO SEEK DAMAGES ON BEHALF OF ITS MEMBERS

Defendants repeatedly allege that CPA lacks standing to seek damages on behalf of its members.  Defs.' Br. at 23-24, 30-31, 37-39.  But as Defendants concede, CPA has alleged that it is the assignee of its members' claims.  Defs.' Br at 24 (citing Amended Complaint ¶ 24). Defendants nonetheless fault CPA for not asserting "facts in support of such assignment" and for not attaching 1700+ assignments.  *Id.*  That is meritless.  The Amended Complaint alleges that CPA's members have assigned their claims to CPA.  Amended Complaint ¶ 24.  It is well-established that nothing more is required at this stage of the litigation.  *See, e.g.*, *Raucci v. Candy & Toy Factory*, 145 F. Supp. 3d 440, 454 (E.D. Pa. 2015) (permitting assignee's case to proceed where assignment was not attached to the complaint and noting that an assignee merely "must allege the existence of the assignment in the pleadings" and only later must "prove the fact of the assignment during the course of trial"); *M.W. Widoff, P.C. v. Encompass Ins. Co. of Am.*, No. 10

C 8159, 2012 WL 769727, at *2 (N.D. Ill. Mar. 2, 2012) ("The Plaintiffs plead that they are the assignees of policy holders of the Insurance Defendants. The Insurance Defendants suggest that Plaintiffs need to have alleged 'specific claimant[s]' who assigned their interest to them, the details of the assignments, or even to have attached the alleged assignments to the complaint. Nothing in Rule 8, however, requires a Plaintiff to submit evidence in support of their complaint . . . . The Insurance Defendants argument to the contrary would lead to long-winded, prolix complaints that thwart the purposes of Rule 8 and is without merit."); *U.S. Bank, Nat. Ass'n v. Cromeans*, No. 11-CV-546, 2011 WL 5903941, at *2 (S.D. Ill. Nov. 22, 2011) ("The Court notes that the plaintiff need not attach a copy of the relevant assignment or assignments to the amended complaint; allegations showing the plaintiff's injury in fact is all that is required at the pleading stage."); *Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 872 (N.D. Ill. 2002) ("[Plaintiff] was only required to allege that [the assignor] had assigned his interest to her, and attachment of the assignment to the complaint is not necessary for notice pleading."). It is also well-settled that, in addition contract-based claims, civil "RICO claims are assignable." *See, e.g.*, *Fed. Ins. Co. v. Parello*, 767 F. Supp. 157, 163 (N.D. Ill. 1991) (collecting cases).

Here, CPA's Amended Complaint clearly alleges that its members have assigned their claims so that CPA can obtain recovery on their behalf. Amended Complaint ¶ 24. Thus, CPA has standing to pursue damages on their behalf.

## II. CPA'S CLAIM FOR BREACH OF CONTRACT PURSUANT TO THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS WELL-PLEADED

Defendants' conclusory assertions that CPA has no alleged "no facts" in support of its breach of contract claim and that CPA concedes ABDC did not commit a breach of contract are demonstrably false. CPA clearly alleges that, by intentionally raising BluePoint product prices to supra-competitive levels from 2013 through the present, ABDC has violated ▮▮▮▮▮▮▮▮

17

██████████ of the 2016 CPA Agreement, analogous provisions under the 2009 CPA Agreement, and the covenant of good faith and fair dealing, which is an implied part of those contractual provisions.  Amended Complaint ¶¶ 89-96.  Moreover, although it is not necessary for CPA to establish detailed facts at this stage of the litigation, CPA has submitted objective market data—the accuracy of which Defendants do not dispute—showing that ABDC's pricing to CPA on BluePoint products is totally out of line with pricing available on the open market.  Amended Complaint ¶¶ 52, 53, 54, 55.  CPA has also pleaded that a price list provided by ABDC establishes that Defendants had the ability to drastically reduce BluePoint pricing overnight, but failed to do so for several years.  *See* Amended Complaint ¶ 63.  This improper pricing runs afoul of the covenant of good faith and fair dealing under Pennsylvania law.[2]

"Pennsylvania courts impose a general duty of good faith performance on each party in general commercial contracts."  *John B. Conomos, Inc. v. Sun Co. (R&M)*, 831 A.2d 696, 706 (Pa. Super. Ct. 2003).  *See also Jackson v. Wells Fargo Bank, N.A.*, No. 12-CV-1262, 2013 WL 5945732, at *14 (W.D. Pa. Nov. 6, 2013) ("'[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'") (applying Pennsylvania law) (quoting Restatement (Second) of Contracts § 205 (1979)).  The covenant functions to "limit[] the parties' ability to act unreasonably in contravention of the other party's reasonable expectations," *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 513 (E.D. Pa. 2012), and "to limit the possibility of self-dealing conduct such as 'where the contract grants one party discretion over some aspect of performance,'" *Interwave Tech., Inc. v. Rockwell Automation, Inc.*, No. 05-CV-398, 2005 WL 3605272, at *11 (E.D. Pa. Dec. 30, 2005) (quoting *Curley v. Allstate Ins. Co.*, 289

---

[2] ███████████████████████████████████████████   ███████████████████
████████████████████

F. Supp. 2d 614, 617 (E.D. Pa. 2003)).  "While a comprehensive listing of the examples of bad faith is not possible, the Pennsylvania courts have recognized that certain patterns of conduct may evidence bad faith.  These include: 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'"  *Jackson*, 2013 WL 5945732, at *14 (quoting *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992)).

Thus, while ABDC has the discretion ████████████████████████████████ ███████████████████████████████████████████████████ with suppliers, the implied covenant cabins that discretion to prevent ABDC from evading the spirit of its bargain with CPA by directing supra-competitive profits to ABC's wholly-owned subsidiary at CPA's expense.  *See, e.g.*, *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 513-14 (E.D. Pa. 2012) ("The covenant of good faith may also be breached when a party exercises discretion authorized in a contract in an unreasonable way . . . .  While section five of the mortgage contract did not require HSBC Mortgage to obtain the cheapest or most cost-effective insurance available, it was not entitled to use its discretion to obtain secret kickbacks on policies or charge plaintiffs for insurance covering periods of time that had passed without damage occurring to the property.  Such behavior contravened plaintiffs' reasonable expectations.  For this reason, courts around the country have held in cases with almost identical facts that plaintiffs stated a claim for breach of the covenant of good faith and fair dealing.") (applying Pennsylvania law) (collecting cases).

ABDC does not seriously dispute that BluePoint pricing under the CPA Partnership is uncompetitive.[3]  Instead, ABDC argues that the provisions concerning the process for calculating

---

[3] ABDC argues that CPA has been "paid" so much in the aggregate that its pricing of BluePoint products cannot violate the covenant of good faith and fair dealing.  But the portfolio's overall performance is simply irrelevant to whether or not ABDC has violated the covenant of good faith

████████████████████████ "expressly govern" everything BluePoint-related such that the implied covenant of good faith and fair dealing cannot be used to alter those express terms. Defs.' Br. at 17-20.   It is true that the 2016 CPA Agreement expressly describes ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ But CPA is not seeking to alter those express terms ████████████████████████████████████████████████

████████████████████████████████████. Rather, CPA simply argues that the implied covenant requires ABDC to negotiate ***the pricing inputs*** ███████████████████

█████████████████████████████ underlying those formulas and ███████████

██████ discounts in good faith on CPA's behalf.

*Martrano v. Quizno's Franchise Co.*, No. 08-CV-0932, 2009 WL 1704469 (W.D. Pa. June 15, 2009) (applying Pennsylvania law), recognizes that the covenant applies in analogous circumstances.   That case concerned Quiznos' alleged failure to negotiate contracts with suppliers in good faith on its franchisee's behalf.   The court found that "[e]ven if the Franchise Agreement were interpreted . . . so that no express promise to act in the franchisee's interests in volume service/supply negotiations was deemed to be within the parties' mutual contractual

───────────────────────

and fair dealing with respect to its management of BluePoint product lines.  In any event, the bulk of the monies CPA is "paid" consist not of fees but discounts and rebates tied to CPA members' purchases, which funds CPA provides to its members.  CPA Answer to Amended Counterclaim ¶ 79.  Because the volume of CPA's purchases has substantially increased since the parties first contracted in 2009, so too has the amount of rebates and discounts. ██████████████████████

██████████████████████████████████████

understanding, that same duty could certainly flow from an implied covenant to act fairly in administering a contractual right to bargain on behalf of the franchisees." *Id.* at *17. Moreover, the court found that "the contractual duty against which Quiznos [sic] conduct should be measured may be supplied by the principle that a franchisor must deal fairly with its franchisees." *Id.  See also Fluid Power, Inc. v. Vickers, Inc.*, No. 92-CV-0302, 1993 WL 23854, at *3 (E.D. Pa. Jan. 28, 1993) (applying the implied covenant in the distributorship context).

Similarly, *Temple Univ. Hosp., Inc. v. Grp. Health, Inc.*, 2006 WL 146300 (E.D. Pa. Jan. 12, 2006),[4] concerned an analogous arrangement between healthcare providers Oxford and Multiplan in which Multiplan "promised to provide Oxford's group health plan participants [ ] with access to Multiplan's network of healthcare providers [ ] at discounted rates negotiated by Multiplan." *Id.* at *1. "In exchange for granting Oxford access to MultiPlan's Providers subject to negotiated rates, Oxford was obligated to pay a fee to MultiPlan for its services.  The fee was based on a percentage of the costs that Oxford saved by using MultiPlan's Providers." *Id.*  "Oxford claim[ed] that Multiplan did not comply with the Access Agreement because it failed to obtain reasonable and competitive rates from Temple."  *Id.* at *2.  In response, MultiPlan argued that because it had secured a percentage-based discount off Temple's initial rate under a discount agreement between Temple and MultiPlan, MultiPlan "had no contractual obligation to negotiate any additional discount to the rates with Temple beyond the 10% discount." *Id.* at *3.  The court found that Temple stated a claim for breach of contract under the implied covenant theory because MultiPlan's obligation to "negotiate terms ***relating to the underlying rate*** was an implicit part of

---

[4] Although *Temple* applies New York law, New York law is materially indistinguishable to Pennsylvania law on the relevant principles.

its bargain with MultiPlan" and that "MutiPlan's failure to obtain reasonable and competitive rates from Temple *rendered any [percentage-based] discount illusory*." *Id.* at *3-4 (emphasis added).

Likewise, *In re U.S. Foodservice Inc. Pricing Litig.*, No. 06-CV-1657, 2009 WL 5064468, (D. Conn. Dec. 15, 2009) [hereinafter *U.S. Foodservice*],[5] concerned cost-plus arrangements between U.S. Foodservice ("USF") and its customers whereby USF charged "(1) a cost component based on the prices charged to USF by USF's suppliers, (2) plus an agreed upon mark-up of either a fixed percentage or a set dollar amount." *Id.* at *2. The complaint alleged that USF conspired with so-called value added service providers ("VASPs") "to purchase products that plaintiffs required, sell them at a higher cost to USF, and for USF to then pass the extra cost along to plaintiffs pursuant to the cost-plus arrangements." *Id.* at *3. USF argued that "plaintiffs have not stated a claim for breach of the duty of good faith and fair dealing because USF's pricing was consistent with the contract terms," since "none of the contracts contain any limitation on setting invoices prices, and some of the contracts specify USF's right to set invoice costs." *Id.* at *24. The court rejected that argument and found the allegation "that USF violated its duty of good faith and fair dealing through its deceptive manipulation of the pricing terms of the cost-plus arrangement" sufficiently stated a claim. *Id.*

Here, ABDC and CPA entered into a ███████ "partnership" program, and agreed that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████.[6]

---

[5] Although *In re U.S. Foodservice* applies the law of several states in the context of a class action, those laws are materially indistinguishable to Pennsylvania law on the relevant principles.
[6] While Defendants emphasize that ABDC has many customers other than CPA, that simply has no bearing on the fact that ABDC owes CPA a duty of good faith and fair dealing under the specific

Moreover, ABDC specifically agreed that ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Thus, like the

franchisor in *Martrano* and the distributor in *U.S. Foodservice*, ABDC had an implied duty to

negotiate competitive pricing with suppliers in good faith as a result of its relationship with and

representations to its partner and long-time customer CPA.  And as *Temple* and *U.S. Foodservice*

indicate, ABDC is not absolved of that duty merely because the CPA Agreement includes certain

████████████████████ discounts and general calculations, since CPA's claim focuses on the

good faith determination of the ***underlying pricing*** of BluePoint products.  Based on Defendants'

representations, CPA had the reasonable commercial expectation that pricing on BluePoint

products—not just the aggregate portfolio—would be market competitive. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

terms of CPA's contracts, ████████████████████████████████

██████████

23

████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

████████████████████████████  ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████  ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

As explained above, such abusive pricing practices are the very sorts of self-dealing and contravention of reasonable commercial expectations that courts applying Pennsylvania law have found violates the implied covenant.

None of Defendants' cited authority is to the contrary.  Defendants' lead case, *Eike v. Allergan, Inc.*, 850 F.3d 315 (7th Cir. 2017), is totally irrelevant.  In that action, the Seventh Circuit dismissed a class action brought on behalf of consumers dissatisfied about the price of eye drops because there was no suggestion of collusion or allegations concerning misrepresentations.  *Id.* at 317.  The case had nothing to do with the implied covenant of good faith and fair dealing; indeed, the members of the consumer class did not even contract with the eye drop manufacturers.

The decisions Defendants cite for the proposition that a party cannot invoke the covenant of good faith and fair dealing to alter the "express terms" of a contract fare no better. The court in

*John B. Conomos, Inc. v. Sun Co. (R&M)*, 831 A.2d 696 (Pa. Super. Ct. 2003) actually held that the duty of good faith applied. *Id.* at 707. In *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433 (3d Cir. 1993), the court permitted plaintiff's breach of contract premised solely on an express provision of the contract (a notice clause) to go forward, but dismissed the duplicative breach of contract premised on the implied covenant, because that claim was "based on exactly the same acts which are said to be in breach of express covenants." *Id.* at 439. *See also LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super Ct. 2008) (concluding that *res judicata* barred plaintiff's claim for breach of the implied covenant of good faith and fair dealing because it was subsumed in its previous breach of contract claim that had been dismissed with prejudice in prior litigation). Here, by contrast, CPA has not brought a duplicative breach of contract claim premised on the same acts as its breach of contract premised on the implied covenant. Further, in *Sheinman Provisions, Inc. v. Nat'l Deli, LLC*, No. CIV. A. 08-CV-453, 2008 WL 2758029, at *2 (E.D. Pa. July 15, 2008), the court permitted breach of contract claims "alleging breach of [defendant's] reimbursement and quality control obligations" to proceed, but dismissed plaintiff's untethered implied covenant claims because it did not plead "a breach of a specific duty imposed by the [contract]" in conjunction with those claims. *Id.* at *3. Here, CPA has plead a breach of specific duties in conjunction with its claims based on the implied covenant, ██████████ ████████████████████████████████████████████ ██████████████████████.

Finally, although Defendants seek to dismiss all of CPA's Count One, Defendants' motion does not address CPA's claim for damages under the parties' contract in effect from 2013 through 2016. Those claims are clearly not impacted by ████████████ which came into effect in 2016; indeed, the inclusion of ████████████ in the 2016 CPA Agreement is an admission

that BluePoint pricing was improper from 2013 through 2016. Those claims accrued prior to the 2016 CPA Agreement and remain valid because the 2016 CPA Agreement does not contain a release. *See Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 654–55 (7th Cir. 2013) ("The court clarified that the 2006 IIB Agreement did not extinguish PFG's liability for obligations Acuvest incurred on or before the date on which the 2006 IIB Agreement superseded previous Acuvest-PFG contracts, but that it did absolve PFG of any duty to guarantee obligations incurred by Acuvest beyond that point."); *Pride Mobility Prod. Corp. v. Comfort Med. Supply, LLC*, No. 3:13-CV-452, 2013 WL 2371215, at *4 (M.D. Pa. May 30, 2013) ("[E]ven if the October 2012 Restructure/payment Agreement did constitute a novation that superseded the December 2006 Personal Guaranty, Daley would still be responsible for liabilities CMS incurred to Pride prior to the 2012 Agreement."); *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*, No. 92 C 6089, 1993 WL 360426, at *9, n.4 (N.D. Ill. Sept. 15, 1993) ("Simply because the 1989 Dealer's Agreement provides that the contract 'cancels, supersedes and annuls all prior contracts, agreement and understandings except as stated herein, all negotiations, representations and understandings being merged herein,' does not bar plaintiffs . . . from alleging that Nissan breached this earlier agreement.").

### III.   CPA'S CLAIM FOR FRAUDULENT INDUCEMENT IS WELL-PLEADED

#### A.   CPA's Fraudulent Inducement Claim Is Not Barred Under Principles of Pennsylvania Law

Conspicuously absent from Defendants' Brief is any denial that Defendants told CPA they would negotiate competitive BluePoint pricing on its behalf during the parties' negotiations. Instead, Defendants trot out the typical perfunctory defenses.

##### 1.   The Parol Evidence Rule Does Not Bar CPA's Claim

26

Defendants first contend that the 2016 CPA's integration clause bars any claim for fraudulent inducement.   However, a line of decisions applying Pennsylvania law holds in analogous circumstances that integration clauses do not bar claims for fraud in the inducement as a matter of public policy.  *See Betz Labs., Inc. v. Hines*, 647 F.2d 402, 408 (3d Cir. 1981) ("To give effect to an integration clause permits language to shield a party from the consequences of his fraud, contrary to public policy.  As we have pointed out, the parol evidence rule presupposes a contract binding on the party offering extrinsic evidence, and a contract tainted by fraud is void or voidable at the option of the injured party.  Moreover, the possibility of perjury is insufficient to justify a restrictive approach when there exists the additional requirement that fraud be proved by clear and convincing evidence.  Thus, there is a counterbalance to any uncertainty caused by the absence of a writing.  We find these latter arguments far more persuasive and conclude that if this case were presented to the Pennsylvania Supreme Court, it would hold that evidence of fraud in the inducement is outside the parol evidence rule and, consequently, admissible."); *CoreStates Leasing Inc. v. Housewright*, No. 96-CV-8678, 1998 WL 151028, at *8 (E.D. Pa. Mar. 31, 1998) ("This Court is bound by *Betz* and therefore holds that Defendants' evidence of fraud in the inducement is admissible.").  *See also Martrano*, 2009 WL 1704469, at *14 ("In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it.  No one advocates a return to outworn conceptions.  The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices.").

Moreover, an integration clause, standing alone, does not preclude claims for fraudulent inducement under Pennsylvania law.  Rather, "for the parol evidence rule to apply in a case

involving a fraudulent inducement claim, the court must decide that (1) the written agreement contains terms which ***directly deal*** with the subject matter of the alleged oral representation; and (2) represents the entire contract between the parties." *Techinomics, Inc. v. Forest Power & Energy Holding, Inc.*, No. 17-CV-1859, 2017 WL 2536969, at *4 (W.D. Pa. May 11, 2017) (emphasis added) (quotations and brackets omitted), *report and recommendation adopted*, No. 16-CV-1859, 2017 WL 2506651 (W.D. Pa. June 9, 2017).  Defendants' own cited decisions follow this rule.  *HCB Contractors v. Liberty Place Hotel Assocs.*, 539 Pa. 395, 399 (1995) (parol evidence rule barred fraudulent inducement claim because plaintiff's claim that "during contract negotiations the owners gave specific assurances that they owned and would continue to own the various project elements" was "***specifically addressed*** in the written contract" because a "'Waiver of Liens' provision expressly contemplate[d] that the owners may transfer their interests to new owners") (emphasis added); *1726 Cherry St. P'ship by 1726 Cherry St. Corp. v. Bell Atl. Properties, Inc.*, 439 Pa. Super. 141, 143 (1995) (noting requirement that the "alleged misrepresentations concern a subject ***specifically dealt with*** in the agreements") (emphasis added).

Here, Defendants allege that the parties' agreement does *not* specifically require ABDC to negotiate in good faith on CPA's behalf.  Amended Answer ¶ 8 ("Contrary to CPA's claims, AmerisourceBergen is not a contracting agent for CPA, and further, AmerisourceBergen certainly does not negotiate with any of its product suppliers 'on CPA's behalf.'"); Defs.' Br. at 16 n.9 ("And, to the extent CPA attempts to suggest that ABDC had an implied duty competitively to negotiate with generic manufacturers/suppliers on CPA's behalf, CPA's admissions contradict that hollow conclusion . . . .").  Defendants cannot have it both ways.  Thus, for that additional reason, the parol evidence does not bar CPA's fraudulent inducement claim.  *See Techinomics*, 2017 WL 2536969, at *5 (defendant stated a claim for fraudulent inducement where "Defendant alleges that

Plaintiff made specific fraudulent representations during the parties' negotiations regarding the extent of Technomics' expertise and experience as to both equipment and international market applications" but the agreement concerning the that product did "not specifically address the extent of Plaintiff's expertise and experience").  In any event, the integration clause would not bar CPA's claim for fraudulent inducement against non-signatory ABC.

### 2.    The Gist of the Action Doctrine Does Not Bar CPA's Claim

For much the same reason, the gist of the action doctrine is also inapplicable to CPA's claim for fraudulent inducement.  *See Martrano*, 2009 WL 1704469, at *16 ("Defendants cannot have it both ways.  If, as Defendants contend, the Agreement imposes no duty on Quiznos to refrain from unreasonable profiteering in its approved supplier dealings, then it would seem clear that claims of misrepresentation or omissions concerning such profiteering find their 'gist' in the law of fraud, not contract.").

Moreover, recent Pennsylvania authority finds that the gist of the action doctrine does not bar claims for fraudulent inducement as a matter of law.  *See also Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa. Super. Ct. 2005) ("Following a thorough analysis of the issue, the *eToll* [Pennsylvania Superior] Court concluded that the gist-of-the-action doctrine would apply to bar a claim for fraud in the performance of a contract.  However, it also observed that the gist-of-the-action doctrine would not necessarily bar a fraud claim stemming from the fraudulent inducement to enter into a contract."); *E. Roofing Sys., Inc. v. Cestone*, No. 08 CV 8764, 2012 WL 6051097, at *7 (Pa. Com. Pl. Apr. 13, 2012) ("a tort claim asserting fraudulent inducement to enter into an agreement is not precluded by the gist of the action doctrine since fraudulent inducement allegations do not relate to the defendant's failure to perform obligations under the parties' contract."); *Techinomics*, 2017 WL 2536969, at *3 ("In light of <u>Sullivan</u>, <u>Dixon</u>, and <u>Tellwell</u>, and

for the reasons set forth by this Court in <u>E.J.H. Construction</u>, 2017 WL 658240, at *5, the gist of

the action doctrine should not be viewed as a bar to Defendant's counterclaims for fraudulent

inducement and negligent misrepresentation.") (collecting cases); *H Contractors, LLC v. E.J.H.*

*Constr., Inc.*, No. 16-CV-368, 2017 WL 658240, at *5 (W.D. Pa. Feb. 16, 2017) ("The

Pennsylvania Superior Court has frequently applied the gist of the action doctrine to claims for

fraud in performance of a contract, but not to claims for *fraud in the inducement*.") (emphasis in

original); *Martrano*, 2009 WL 1704469, at *15 (same).

      The only case Defendants cite that actually applied the gist of the action doctrine to a claim

for fraudulent inducement[7] did so because it—unlike this Court—was bound by Third Circuit cases

that that court acknowledged "conflict with recent Superior Court rulings holding that fraudulent

inducement claims may be predicated on a party's intent not to perform." *Vives v. Rodriguez*, 849

F. Supp. 2d 507, 521 (E.D. Pa. 2012).   But even the court in *Vives* found that only

"misrepresentations as to duties later enshrined in a contract are barred by the doctrine." *Id.*  As

explained above, Defendants deny that ABDC had a duty to negotiate pricing with BluePoint under

the contract, and "Defendants cannot have it both ways." *Martrano*, 2009 WL 1704469, at *16.

Moreover, recent decisions from Pennsylvania's federal courts are at odds with *Vives* and instead

follow Pennsylvania state court decisions finding the gist of the action doctrine inapplicable to

---

[7] None of Defendants' other cited cases apply the gist of the action doctrine to a fraudulent
inducement claim.  *See eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 17 (Pa. Super.
Ct. 2002) (addressing a claim for fraud in the performance of a contract, but noting that "fraud in
the inducement of a contract would not necessarily be covered by [the gist of the action] doctrine");
*Hart v. Arnold*, 884 A.2d 316, 341 (Pa. Super. Ct. 2005) ("Appellant's fraud in the performance
claims are barred under the gist of the action doctrine, because they are collateral to the contract,
which is the main cause of action."); *Reardon v. Allegheny Coll.*, 926 A.2d 477, 487 (Pa. Super.
Ct. 2007) (applying gist of the action doctrine to negligence claims).

claims for fraudulent inducement.  *See Techinomics*, 2017 WL 2536969, at *3; *H Contractors,* 2017 WL 658240, at *5.

### 3.   The Economic Loss Doctrine Does Not Bar CPA's Claim

Finally, it is black-letter law that the economic loss doctrine does not apply to claims for fraud in the inducement under Pennsylvania law.  *See H Contractors*, 2017 WL 658240, at *6 ("the current state of the law suggests that the economic loss doctrine bars only claims sounding in negligence that result solely in economic damages unaccompanied by physical injury or property damage") (denying motion to dismiss fraudulent inducement claim); *Honey Creek Stone Co. v. Telsmith, Inc.*, No. 03-C.A.-11347, 2009 WL 6371627 (Pa. Com. Pl. Dec. 31, 2009) ("Defendants aver that the economic loss doctrine applies to bar a claim of fraudulent inducement because it is actually a renewal of the negligence claim that was stricken from Honey Creek's complaint . . . .   Honey Creek's fraudulent inducement claim is a different theory than the negligence actions from Honey Creek's original complaint.  Therefore, the court gives no weight to defendants' argument regarding the applicability of the economic loss doctrine.").  *See also U.S. Small Bus. Admin v. Progress Bank*, No. 03-CV-3461, 2004 WL 2980412, at *7 (E.D. Pa. Dec. 22, 2004) ("the emerging trend in lower Pennsylvania courts and in other jurisdictions has been to permit purely economic recovery in causes of action for intentional fraud.  Many such courts have found that claims for intentional fraudulent conduct are an exception to the economic loss doctrine and no Pennsylvania court has found that the doctrine precludes recovery in the face of a claim for intentional wrongdoing.") (collecting cases).

As with the gist of the action doctrine, the only case Defendants cite that applied the economic loss doctrine to bar a claim for fraudulent inducement did so because it—unlike this Court—felt bound by Third Circuit precedent.  *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F.

Supp. 2d 643, 659 (E.D. Pa. 2002) ("In light of *Werwinski,* Reilly Foam cannot avoid application of the doctrine.") (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 66 (3d Cir. 2002)).  *Werwinski*, however, has been rejected by Pennsylvania courts.  *See H Contracts, LLC*, 2017 WL 658240, at *6 (noting "the rejection of *Werwinski* . . . by the Pennsylvania appellate courts").  Finally, as with Amerisource's other defenses related to fraud, the economic loss rule (even if otherwise applicable) would not apply here because Defendants deny that ABDC had a duty to negotiate pricing with BluePoint under the contract, and "Defendants cannot have it both ways."  *Martrano*, 2009 WL 1704469, at *16.

### B. CPA's Fraudulent Inducement Claim Satisfies Federal Rule of Civil Procedure 9(b)

"In the Seventh Circuit, a plaintiff who provides a general outline of the fraud scheme sufficient to reasonably notify the defendants of their purported role in the fraud satisfies Rule 9(b)."  *Walls v. Vre Chicago Eleven, LLC*, No. 16-CV-4048, 2016 WL 5477554, at *8 (N.D. Ill. Sept. 29, 2016).  The purpose of Rule 9(b) is simply to provide Defendants with "fair notice" of the nature of the claim.  *See id.* ("Fair notice is perhaps the most basic consideration underlying Rule 9(b)."). *See also Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 897 (N.D. Ill. 2009) (Allegations "sufficient to reasonably notify the defendants of their purported role in the fraud satisfies Rule 9(b).") (quotation omitted).

Here, CPA clearly alleges the "who, what, when, where, and how" of its fraudulent inducement with sufficient particularity.

Who:    "Amerisource personnel such as Stephen Hendrickson"

What:   "Amerisource would undertake a course of action to more actively manage the pricing of BluePoint product lines,"

When:   "in December 2015"

> Where:    "at ABC's Pennsylvania headquarters"
>
> How:   By falsely claiming Amerisource "would actively manage the pricing of BluePoint
>              product lines," even though "ABDC has not actively negotiated competitive
>              costs of the BluePoint product lines" and in fact "after the parties entered into
>              the 2016 CPA Agreement, the disparity in BluePoint pricing increased"

Amended Complaint ¶¶ 15, 21. *See also id.* ¶ 14 ("personnel from both ABC and ABDC falsely

assured CPA that they were and would continue to competitively manage BluePoint pricing."); *id.*

¶ 44 ("Over the course of the 2016 contract negotiations, Amerisource represented orally and in

written correspondence that it would ensure that it would continue to negotiate with BluePoint on

CPA's behalf in the exact same fashion as it does with respect to all other products under the CPA

Partnership.  Specifically, Amerisource represented that ██████████████████████████████

██████████████████████████████████████████████ in-line with the overall

market.").

   Thus, CPA's Amended Complaint clearly satisfies Rule 9(b).  *See Vanhuss v. Kohn Law*

*Firm S.C.*, 127 F. Supp. 3d 980, 984 (W.D. Wis. 2015) ("According to defendants, VanHuss made

an erroneous statement at a pre-trial conference on July 2, 2013, that she was a 'sole proprietor.'

This alone suffices to establish the 'when, where and how' of the alleged mistake, as well as *who*

precipitated it.  Defendants have also alleged *what* their mistake actually was: based on VanHuss's

statement that she was a sole proprietor, defendants believed incorrectly that Joint Effects was a

sole proprietorship and that they could legally garnish its accounts. This is sufficient to comply

even with the heightened standard of Rule 9(b)."); *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,

No. 14-CV-748-WMC, 2015 WL 7301245, at *7 (W.D. Wis. Nov. 18, 2015) ("As plaintiff

convincingly details, the allegations of the complaint meet each of those requirements: the 'who'

(the TCS employee, with TCS's knowledge); the 'what' (the TCS employee representing that he

was a Kaiser employee, using a 'kp.org' email address, and altering his email signature line); the

'when' (at the time the TCS employee registered, before June 2014); the 'where' (in the registration for credentials and in the emails); and the 'how' (by falsely identifying himself as a Kaiser employee instead of a consultant to gain access offered to customers).").

CPA's complaint also clearly alleges involvement by ABC.  CPA alleges ABC had a motive to fraudulently induce CPA to enter into the 2016 CPA Agreement because both ABC and ABDC benefit from recognizing inflated profits under Ireland's low corporate tax rate through ABC's wholly-owned BluePoint subsidiary.  *See, e.g.*, Amended Complaint ¶ 23.  Moreover, CPA alleges that both ABC and ABDC employees participated in the negotiations of the 2016 CPA Agreement.  *See id.* ¶ 14 ("personnel from both ABC and ABDC falsely assured CPA that they were and would continue to competitively manage BluePoint pricing.").  Indeed, CPA alleges that the misrepresentations were made at ABC's Pennsylvania headquarters.  *See id.* ¶ 15.  That is sufficient to satisfy Rule 9(b) because a complaint need not identify specific corporate employees in a case concerning corporate fraud.  *See Walls*, 2016 WL 5477554, at *8 ("VRE and Verdad argue that the complaint does not comply with Rule 9(b) because it does not allege the specific individual(s) who made the representations.  VRE and Verdad do not cite any case law that holds that a complaint must be dismissed unless it identifies the specific corporate employee responsible for each alleged misrepresentation.").  *See also Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 880 F. Supp. 1202, 1211 (N.D. Ill. 1995) ("where a complaint involves allegations of corporate fraud, the particularity requirement may be relaxed where it is difficult to attribute particular fraudulent conduct to each defendant as an individual.").

## IV.    CPA'S CLAIM UNDER RICO IS WELL-PLEADED

To sustain a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege that the defendant was (1) conducting the affairs; (2) of an enterprise; (3) through a pattern; (4) of

racketeering activity. *See, e.g.*, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Martrano v. Quizno's Franchise Co.*, No. CIV.A. 08-0932, 2009 WL 1704469, at *9 (W.D. Pa. June 15, 2009). To plead a "pattern" of "racketeering activity," a plaintiff must allege at least two "predicate acts" of racketeering activity, which may include violations of federal mail and wire fraud statutes. *See* 18 U.S.C. § 1961(1) (including violations of sections 1341 and 1341 in the definition of "racketeering activity"); § 1961(5) (a "pattern . . . requires at least two acts of racketeering activity").

CPA's Amended Complaint sufficiently pleads each element of a RICO claim. The Amended Complaint describes, in thorough detail, a calculated, duplicitous scheme wherein Defendants and BluePoint acted in concert to generate and disseminate thousands of fraudulently inflated invoices which were deliberately designed to force CPA and its members to vastly overpay for BluePoint products. Defendants' actions fall squarely under the rubric of RICO because their scheme hinged on exploiting BluePoint's separate corporate identity in an attempt to coat their sham "price negotiations" with a veneer of legitimacy. Moreover, as CPA alleges, Defendants acted (and continue to act) purposefully to deceive CPA by artificially driving up the cost of BluePoint products in service of a massive fraud using the mails and wires.

In their Brief, Defendants attack CPA's RICO claim on several grounds, including that CPA has failed to sufficiently plead the "enterprise," "pattern," and "racketeering activity" elements of a RICO violation, and that the claim is time-barred. Defs.' Br. at 39-46. As explained below, each of these grounds lacks merit. But Defendants do not stop there. They argue that CPA's RICO claim is "frivolous" and "irresponsible"—that it is "constructed entirely of hollow conclusions" and exhibits "a disrespect for both the law and the Rules of Civil Procedure." Defs.' Br. at 33. Indeed, Defendants claim that CPA and its counsel should be "sanction[ed] . . . for

unreasonably and vexatiously increasing the costs of litigation." Defs.' Br. at 33. Unfortunately for Defendants, no quantity of overheated hyperbole can alter the hard-and-fast contents of CPA's pleadings, which include a raft of detailed factual allegations that depict a situation far more serious than a garden-variety contract dispute. Accordingly, Defendants' motion and demand for sanctions must be denied.

### A.  CPA Sufficiently Pleads a Distinct RICO Enterprise

The allegations in the Amended Complaint are sufficient to establish that BluePoint, ABC, and ABDC constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "BluePoint Enterprise"). It is a "basic principle" of RICO litigation that "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). In other words, a plaintiff must show "that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* at 163 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). Thus, for a RICO to proceed, a plaintiff must allege some type of "formal or practical separateness" between the defendant(s) and the enterprise such that they are sufficiently "distinct" under § 1962(c). *Id.* (citing *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985)).

RICO claims against corporate defendants are viable so long as they include allegations that the corporate defendants are "functionally separate" from the RICO enterprise, "as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013); *see also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir. 1993). Thus, federal courts consistently find the "distinctiveness" requirement satisfied when the alleged RICO "person" is a corporate parent, and the RICO "enterprise" is comprised of both the corporate parent and one or more of its

subsidiaries.  *See, e.g.*, *Polymer Dynamics, Inc. v. Bayer Corp.*, No. 99-CV-4040, 2000 WL 1146622, at *6 (E.D. Pa. Aug. 14, 2000) (plaintiff stated a claim under RICO where it alleged that subsidiary and parent "each played a distinct role" and that one affiliate conducted the affairs of an "'enterprise' of affiliated entities"); *Fed. Reserve Bank of San Francisco v. HK Sys., Inc.*, No. C-95-1190 MHP, 1997 WL 765952, at *4 (N.D. Cal. Nov. 12, 1997) (corporate parent's "involvement in the racketeering activity . . . was sufficiently distinct from its control over the day-to-day activities of its subsidiary . . . which constituted the 'enterprise.'"); *Philadelphia TMC, Inc. v. AT & T Info. Sys., Inc.*, 651 F. Supp. 169, 173 (E.D. Pa. 1986) ("The fact that a wholly-owned subsidiary is compliant to the will of its parent corporation in no way precludes the parent from associating with the subsidiary, or from conducting the subsidiary's affairs through a pattern of racketeering activity.").

In the Amended Complaint, CPA alleges that "[w]hile ABC and ABDC have participated in and are members . . . of the BluePoint Enterprise, they also have an existence separate and distinct from the enterprise."  Amended Complaint ¶ 107.  This allegation is founded not only on the formal separateness of ABC, ABDC, and BluePoint (each is a stand-alone, separately incorporated entity), but also on the fact that each plays a distinct role in the *operation* of the enterprise.  *See* Amended Complaint ¶¶ 3-4, 6, 11, 44-45, 51, 56-59, 67, 79-84.  The scheme only worked because Defendants falsely represented to CPA that ABDC was competitively managing BluePoint pricing by negotiating with BluePoint on CPA's behalf in good faith.  Amended Complaint ¶¶ 14, 18, 81.  This fiction—that Defendants and were negotiating in good faith— hinged on the notion that BluePoint had at least some degree of separate decision-making autonomy—that is, that ABC and ABDC were not simply setting BluePoint prices on their own.  For the scheme to be viable, BluePoint had to play the role of a supplier, separate and distinct from

ABDC's role as the purchaser.  Taken together, these allegations are more than sufficient to satisfy the "distinctiveness" requirement.

In arguing to the contrary, Defendants maintain that, *categorically*, "a parent and its subsidiaries cannot be considered a distinct enterprise for RICO purposes." Defs.' Br. at 40.  The overwhelming weight of federal case law, however, (including Defendants' own cited cases) does not support such a sweeping proposition.  *See, e.g.*, *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 934 (7th Cir. 2003).  In *Bucklew* for example, as Defendants correctly point out, the Seventh Circuit affirmed the dismissal of a RICO claim because the alleged RICO "person" (a corporation) was not sufficiently distinct from the alleged RICO "enterprise" (the corporation's subsidiary).  But crucially, in reaching that conclusion, the Court reasoned:  "A parent and its wholly owned subsidiaries [do not] have sufficient distinctness to trigger RICO liability . . . *unless the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its unlawful activity, which has not been shown . . . .*" *Id.* (emphasis added)[8].  Here, unlike in *Bucklew*, the decision to operate through BluePoint was and remains integral to the unlawful racketeering activity.  That fundamental distinction compels a different result.

## B.  CPA Sufficiently Pleads a "Pattern" of Racketeering Activity

The Amended Complaint also sufficiently establishes a "pattern" of racketeering activity.  To establish a "pattern" of racketeering activity, a plaintiff must allege "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a

---

[8] *Emery v. American General Finance Inc.*, another case Defendants cite, similarly leaves open the possibility of a RICO enterprise consisting of "affiliates or agents" of the corporate RICO defendant.  *See* 134 F.3d 1321, 1324 (7th Cir. 1998) ("The firm must be shown to use its agents or affiliates in a way that bears at least a family resemblance to the paradigmatic RICO case in which a criminal obtains control of a legitimate (or legitimate-appearing) firm and uses the firm as the instrument of his criminality.")

prior act of racketeering activity."  18 U.S.C. § 1961(5).   "[I]t is the relationship of the predicate acts to each other and the extent to which they indicate continuity that are critical to the formation of a pattern."  *Martinez v. Calimlim*, 651 F. Supp. 2d 852, 859 (E.D. Wis. 2009) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  "Under the 'continuity plus relationship' test, a plaintiff can establish a pattern by showing that the predicate acts are related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)."  *Id.*

A plaintiff satisfies the "relatedness" or "relationship" prong by alleging that the relevant predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Tabas v. Tabas*, 47 F.3d 1280, 1292 (3d Cir. 1995) (quoting *H.J. Inc.*, 492 U.S. at 240). To establish continuity, on the other hand, a plaintiff may plead either:  "(1) closed-ended continuity through allegations of repeated predicate acts extending over a 'substantial' (at least twelve-month) period . . . or (2) open-ended continuity through allegations that 'the predicates are a regular way of conducting defendant's ongoing legitimate business . . . .'"  *HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc.*, 590 F. Supp. 2d 677, 687–88 (D.N.J. 2008) (quoting *H.J. Inc.*, 492 U.S. at 243).

The repeated mailing of fraudulently inflated invoices over a period of multiple years has been held, in numerous prior cases, to constitute a "pattern" of racketeering activity.  *See, e.g.*, *U.S. Foodservice*, 2009 WL 5064468, at *16; *HT of Highlands Ranch, Inc.*, 590 F. Supp. 2d at 687–88; *Williams Elecs. Games, Inc. v. Barry*, 42 F. Supp. 2d 785, 795 (N.D. Ill. 1999), *aff'd sub nom. Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569 (7th Cir. 2004); *Arenson*, 880 F. Supp. at 1211.

Here, in similar fashion to the plaintiffs in each of the foregoing cases, CPA alleges that Defendants "engaged in thousands of separate fraudulent transactions in furtherance of [their] scheme by issuing thousands of fraudulently inflated billings ███████████████████████ ████████████████████████████████████████████" Amended Complaint ¶ 84.  That each of the alleged predicate acts has "the same purpose, results, participants, victims, or methods of commission" is virtually self-evident.  *See Tabas*, 47 F.3d at 1292.  Defendants disseminated the invoices containing "bullshit pricing" to cheat CPA and its members out of millions of dollars. Amended Complaint ¶¶ 66, 79-84.  Each invoice was deliberately designed to achieve that end. Amended Complaint ¶¶ 79-84.

Moreover, regardless of whether a "closed-ended" or "open-ended" lens is applied, the allegations in the Amended Complaint demonstrate continuity.  As CPA alleges, "The multiple acts of racketeering activity which Defendants committed" occurred repeatedly, "in an open and substantial period of time at least during the period from 2013 to the present"—at least five years. Amended Complaint ¶ 120.  Further, this conduct not only "*threatens* to continue to occur in the future," Amended Complaint ¶ 120 (emphasis added), but in fact *actually* continues to cause injury to this day.  Amended Complaint ¶¶ 84, 95, 120, 127.  And inflation of BluePoint prices was not a one-off; it was a deliberate business decision and part of the regular way Defendants' conduct their business.  *See, e.g.*, Amended Complaint ¶¶ 63-69, 79-83.  These allegations are more than sufficient to satisfy the "pattern" element of a RICO claim.  *See, e.g.*, *HT of Highlands Ranch, Inc.*, 590 F. Supp. 2d at 688 ("Plaintiffs' pleadings survive . . . under either a closed- or open-ended continuity analysis" because "the repeated mailing of allegedly fraudulent invoices to multiple franchisees over the course of at least fifteen months is sufficient . . . for closed-ended continuity" and "Plaintiffs have alleged that conduct . . . was consistent with 'the regular way of operating [of]

40

the Corporate Defendants'"); *Arenson*, 880 F. Supp. at 1210-11 ("Continuity has been established

. . . under both the closed- and open-ended concepts" because "[t]he alleged predicate acts have

been committed over a period of five years," "each mailing of an allegedly fraudulent bill . . .

indicated a continuation of the fraudulent activity," and "threat of repetition exists because there

is no indication that the defendants will cease engaging in the predicate acts").

### C.  CPA Sufficiently Pleads Predicate Acts of Mail and Wire Fraud

The allegations in the Amended Complaint are likewise sufficient to establish thousands

of predicate acts of mail and wire fraud.  A predicate act of racketeering activity includes any act

indictable under certain specific provisions of the United States Code, including 18 U.S.C. §

1341 (mail fraud) and § 1343 (wire fraud).  18 U.S.C. § 1961(1).  Mail or wire fraud occurs

whenever a person, "having devised or intending to devise any scheme or artifice to defraud" or

"for obtaining money or property by means of false or fraudulent pretenses, representations, or

promises," uses the mail or interstate wires "for the purpose of executing such scheme or artifice."

*Id.* §§ 1341, 1343.  To plead a predicate act of mail or wire fraud, a plaintiff must allege "(1) the

existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the

scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme."

*U.S. Foodservice*, 2009 WL 5064468, at *16 (quoting *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing

Corp.*, 84 F.3d 629, 633 (2d Cir.1996)).  A scheme to defraud "need not be fraudulent on its face,

but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to

deceive persons of ordinary prudence and comprehension."  *HT of Highlands Ranch, Inc.*, 590 F.

Supp. 2d at 685 n.8.  *See also United States v. Paneras*, 222 F.3d 406, 409-10 (7th Cir. 2000).

Allegations that a defendant has disseminated artificially inflated invoices, which are

specifically designed to defraud the recipient, are routinely found sufficient to establish a predicate

act of mail or wire fraud in support a RICO claim.  *See, e.g.*, *U.S. Foodservice*, 2009 WL 5064468,

at *16-19; *Martrano*, 2009 WL 1704469, at *9-10; *HT of Highlands Ranch, Inc.*, 590 F. Supp. 2d at 685; *Arenson*, 880 F. Supp. at 1212.

Defendants maintain that CPA's Amended Complaint fails to plead predicate acts of mail and wire fraud for two reasons. *First*, Defendants argue that CPA's allegations lacked the required specificity because they failed to identify the content and the time or place of the alleged fraudulent misrepresentations. Defs.' Br. at 43-46. *Second*, Defendants argue that CPA's allegations of racketeering activity "is an improper attempt to convert its garden-variety purported breach of contract action . . . into a RICO case." Defs.' Br. at 33-37. Both arguments lack merit.

### 1. CPA Alleges Mail and Wire Fraud with Sufficient Specificity

Defendants' first argument rests on a misreading of the relevant law. While "[t]here can be little doubt that [Federal Rule of Civil Procedure] 9(b) . . . applies to fraud allegations in civil RICO complaints," *Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 747 F.2d 384, 405 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985), "where a complaint involves allegations of corporate fraud, the particularity requirement may be relaxed . . . ." *Arenson*, 880 F. Supp. at 1208. *See also U.S. Foodservice*, 2009 WL 5064468, at *18 (quoting *Tiesinga v. Dianon Sys., Inc.*, 231 F.R.D. 122, 123 (D. Conn. 2005)) ("courts have relaxed Rule 9(b)'s heightened pleading requirements in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and involving thousands of billing documents."); *Fujisawa Pharm. Co. v. Kapoor*, 814 F. Supp. 720, 726 (N.D. Ill. 1993) ("where fraud allegedly occurred over a period of time, the requirements of 9(b) are less stringently applied"). As the Northern District of Illinois explained in *Fujisawa Pharmaceutical*:

> Rule 9(b) is not to be read blindly, but is to be applied in order to effectuate the purposes of the rule which are: (1) to inform the defendants of the claims against them and to enable them to form an adequate defense; (2) to eliminate the filing of a conclusory complaint as a pretext for using discovery to uncover wrongs; and (3)

to protect defendants from unfounded charges of fraud which may injure their reputations.

814 F. Supp. 720, 726 (N.D. Ill. 1993).[9]  Where misstatements underlying the allegations of mail fraud appear in thousands of billing documents, "dates, times and places need not be pleaded with absolute precision, so long as the allegations sufficiently put the defendant on notice as to the circumstances of the charged misrepresentations." *U.S. Foodservice*, 2009 WL 5064468, at *18 (quoting *Harris v. Wells*, 757 F.Supp. 171, 174 (D. Conn. 1991)).  *See also Haroco, Inc.*, 747 F.2d 384, 405 ("There would have been little point in requiring plaintiffs to expand the complaint by also identifying each notice which included an [overstated] interest rate.").[10]

---

[9] *See also U.S. Foodservice*, 2009 WL 5064468, at *18 (quoting *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004)) ("It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.").

[10] Defendants also cite *In re Mastercard International Inc.*, 313 F.3d 257, 263 (5th Cir. 2002) and *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 218-19 (S.D.N.Y. 2002) for the proposition that predicate acts of mail and wire fraud cannot lie without a showing of "reasonable reliance." Defs' Br. at 45.  Because the Amended Complaint does not set forth a comprehensive list showing the dates of each fraudulent invoice, and each specific price misrepresentation contained therein, Defendants maintain that CPA cannot allege "reasonable reliance" as a matter of law.  This argument fails on two fronts.  First, as the Supreme Court clarified in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008), "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." Second, even if CPA was required to include such allegations here, it has done so.  *See* Amended Complaint ¶ 81 ("BluePoint was designed to, and did, induce CPA to rely on ABDC's material misrepresentations, enter into the 2016 CPA Agreement with ABDC, place orders for BluePoint products from ABDC, and make payments to ABDC. Moreover, such reliance was reasonable under the circumstances because Amerisource intentionally used BluePoint to hide the scheme from CPA and concealed from CPA the true purpose of BluePoint.").  *See also Arenson*, 880 F. Supp. at 1212 (allegations that "[plaintiffs] paid [defendant], to their financial detriment, more money than they would have paid if the bills they received from [defendant] showed the actual amounts charged for the Pharmaceuticals . . . rather than the inflated amounts" were "sufficient to allege detrimental reliance").

Here, CPA's Amended Complaint pleads predicate acts of mail and wire fraud with more than adequate specificity.  Among other things, CPA alleges:

- 

  Amended Complaint ¶ 80.

- On information and belief, between 2013 to the present, Amerisource engaged in thousands of separate fraudulent transactions in furtherance of its scheme by issuing thousands of fraudulently inflated billings ████████████████████████ ████████████████████████████.  Amended Complaint ¶ 84.

- The matter and things sent by Defendants via the Postal Service, private or commercial carrier, wire or other interstate electronic media include, among other things, contracts and billings that intentionally misled CPA about the manner in which ABDC computed prices charged to it; billings that falsely and fraudulently misrepresented the amounts that CPA owed ABDC under the terms of the ████ arrangement; materials that falsely and fraudulently ████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████.''  Amended Complaint ¶ 113.

- Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving CPA and obtaining CPA's property for Defendants' gain.  Amended Complaint ¶ 115.

Additionally, to provide particular examples of the relevant misrepresentations, the Amended Complaint contains four separate charts which identify several specific BluePoint products that were sold to CPA at grossly inflated prices.  *See* Amended Complaint ¶¶ 52-55.  Portions of the data in these charts were pulled directly from invoices in February and May of 2018.  *See* Amended Complaint ¶¶ 52-55.  This level of detail is more than sufficient to provide Defendants adequate notice of the conduct underlying the CPA's RICO claim, and thus fulfil the purpose of Rule 9(b).  *See U.S. Foodservice*, 2009 WL 5064468, at *18 ("Here, the Complaint describes how the invoices furthered the scheme by forwarding the allegedly falsely inflated cost

information to the plaintiffs buying products on a cost-plus basis. The defendants can adequately frame a response to these allegations, and Rule 9(b) requires nothing more.").

> 2. <u>CPA's Allegations of Racketeering Activity Are Not Duplicative of Its Breach of Contract Claim</u>

Defendants' second argument—that CPA's RICO claim impermissibly repackages its breach of contract claim—also fails.  In their motion, Defendants cite several cases in support of the unremarkable proposition that "garden-variety" contract breaches cannot form the basis of a RICO claim.  Defs.' Br. at 33-35.  However, it is equally well-settled that detailed allegations which "go beyond a mere breach of contract claim" by describing duplicitous transactions undertaken with a specific intent to defraud[11] are squarely within "the realm of RICO," regardless of whether they simultaneously constitute a breach of contract.  *Brown v. Access Midstream Partners, L.P.*, 141 F. Supp. 3d 323, 335 (M.D. Pa. 2015); *see also Castellanos v. Worldwide Distribution Sys. USA, LLC*, 290 F. Supp. 3d 692, 699 (E.D. Mich. 2017); *Jeter v. Wild W. Gas, LLC*, No. 12-CV-411-TCK-PJC, 2015 WL 5970992, at *13 (N.D. Okla. Oct. 14, 2015); *Suessenbach Family Ltd. P'ship v. Access Midstream Partners, L.P.*, No. CIV.A. 3:14-1197, 2015 WL 1470863, at *13 (M.D. Pa. Mar. 31, 2015).

*Brown v. Access Midstream Partners, L.P.* is particularly instructive.  There, landowners in Pennsylvania entered into lease contracts with a large energy company, which granted the energy company the right to extract and transport natural gas from the landowners' lands.  *Brown*, 141 F. Supp. 3d at 328-29.  Under the terms of the leases, the landowners were entitled to certain royalty payments, which the energy company was obligated to pay after deducting certain

---

[11] A specific intent to defraud can be pleaded by "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re U.S. Foodservice Inc. Pricing Litig.*, 2009 WL 5064468, at *16 (quoting *S.Q.K.F.C., Inc.*, 84 F.3d at 634).

transportation costs.  *Id.* at 330-31.  Upon noticing a precipitous decline in their royalty payments, the landowners brought a RICO claim against the energy company and the natural gas transportation company with which it was working, alleging that the companies were conspiring to inflate the transportation costs, and then fraudulently shifting the inflated costs onto landowners artificially reducing their royalty payments.  *Id.* at 329-32.  The defendant companies argued that the case "does not fall under RICO, but is essentially a breach of contract action."  *Id.* at 334.  The court disagreed:

> [T]he plaintiffs here are alleging something more than a simple breach of contract claim.  The plaintiffs are alleging that the defendants entered into an unlawful agreement to purposefully charge inflated gathering and transportation costs for the specific purpose of disguising the true nature of the deductions from lessors' royalty payments.  Thus, beyond the terms of their contracts . . . the plaintiffs allege that the defendants engaged in fraudulent transactions specifically to disguise the fact that the defendants were deducting monies that they were not legally entitled to and were unlawfully profiting at the plaintiffs' expense.  ***These allegations, even if connected to the plaintiffs' leases, concern a specific intent to defraud and deceive the lessors.  These actions, whether or not they also constitute a breach of contract, appear to go beyond a simple breach of contract claim and bring them into the realm of RICO***.  As such, the defendants' motions to dismiss will be denied on this basis.

*Id.* at 334-35 (emphasis added).

The same analysis applies to Defendants' argument here.  The fact that Defendants' repeated dissemination fraudulently inflated invoices constitutes repeated breaches of contract is irrelevant; the dissemination of invoices may still form the basis of CPA's RICO claim.  The Amended Complaint contains numerous allegations from which a strong inference of specific intent can be derived, including Defendants' clear motive to maximize their own profits (Amended Complaint ¶¶ 11, 58, 59) and the unique opportunity that the CPA Partnership afforded them (Amended Complaint ¶¶ 44-46, 79-84).  Further, CPA's allegations that Defendants made statements admitting they can manipulate BluePoint prices at their whim (Amended Complaint ¶¶

46

61-67)—if accepted as true, as they must be here—constitute strong circumstantial evidence that Defendants are indeed conscious of their own misbehavior.  These allegations establish a course of conduct that goes far beyond a "garden-variety" breach of contract claim.  Rather, the conduct described herein fits squarely within the RICO paradigm.

### D.  CPA's RICO Claim Is Not Time-Barred

In addition to their meritless attacks on the substantive sufficiency of CPA's RICO allegations, Defendants also contend that the claim is time-barred by RICO's four-year statute of limitations.  Defs.' Br. at 46-48.  Defendants argue that CPA has been aware of BluePoint's inflated pricing since 2013 and that consequently, the statute of limitations expired in 2017.  Defs.' Br. at 46-47.  This argument is without support in both fact and law.

*First*, Defendants fail to apply the correct accrual rule.  Courts in the Seventh Circuit apply a "separate accrual" rule to civil RICO claims.  *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992), *as amended on reh'g in part* (Oct. 26, 1992).  "As in a civil antitrust case, a new cause of action under RICO arises on the occurrence of each separate injury, and a suit to recover for that injury must be brought within the [four-year] limitations period."  *Id.*  In other words, a new limitations period applies to each new RICO injury.  *See id.*  Under the "separate accrual" rule, the statute of limitations has not expired here because, as CPA repeatedly alleges in the Amended Complaint, Defendants continue to generate fraudulently inflated invoices under the CPA Partnership to this day.  Amended Complaint ¶¶ 84, 95, 120, 127.  Each new fraudulent invoice is a new predicate act, which creates a new and independent injury with its own statute of limitations.  Thus, the vast majority of CPA's RICO injuries (those sustained after July 2014, within four years of the complaint's filing) easily satisfies the applicable statute of limitations.

*Second*, Defendants ignore the robust allegations of fraudulent concealment in the Amended Complaint, which require the statute of limitations to be equitably tolled with respect to CPA's early 2013 and early 2014 RICO injuries.  As the Seventh Circuit has explained*:*

> Equitable estoppel [in the statute of limitations context] suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing . . . .  Fraudulent concealment is a type of tolling within the doctrine of equitable estoppel.  Fraudulent concealment presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time.  In order for a plaintiff to benefit from tolling for fraudulent concealment, he must show that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense. . . . .  The doctrine of fraudulent concealment protects both the diligent and the non-diligent plaintiff . . . from the expiration of claims the factual basis for which was shrouded by the veil of fraudulent concealment.

*In re Copper Antitrust Litigation*, 436 F.3d 782, 790-92 (7th Cir. 2006) (quotations omitted).

Here, CPA were not, and could not have been aware of Defendants' scheme to inflate BluePoint pricing until 2016 at the earliest.  Amended Complaint ¶¶ 81-82.  CPA first learned that BluePoint pricing was significantly higher than the rest of the portfolio in late 2015 during the course of the parties' negotiation of the 2016 CPA Agreement.  Amended Complaint ¶ 42. Although CPA knew then that BluePoint products were performing poorly, CPA did not know that what was driving the poor performance was a deliberate and coordinated scheme to inflate BluePoint pricing and recognize inflated profits under Ireland's favorable tax laws.  Moreover, Defendants prevented CPA from discovering that underlying scheme by repeatedly and fraudulently representing to CPA that it was negotiating with BluePoint in good faith and would continue to do so throughout the term of the 2016 CPA Agreement.  Amended Complaint ¶¶ 44, 46, 81-82.  Only after entering into the 2016 CPA Agreement and discovering that, contrary to Defendants' representations, BluePoint pricing actually *worsened* did CPA have a basis to suspect

48

Defendants' fraud.  Amended Complaint ¶ 47-50.  Indeed, CPA did not learn of Defendants' fraud until April 2018 ███████████████████████████, which revealed that Defendants were solely in control of BluePoint pricing.  Amended Complaint ¶¶ 66-69.  Accordingly, the statute of limitations should be tolled until at least 2016.

### E.  CPA's RICO Claim Applies to ABC with Equal Force

Defendants' final argument is that CPA fails to articulate RICO allegations against ABC specifically, and thus, even if a RICO claim can proceed against ABDC, it must be dismissed as against ABC.  Defs.' Br. at 48.  But again, the allegations in the Amended Complaint contradict Defendants' assertion.

As the Amended Complaint makes clear, ABC, as ABDC's parent company, "had full knowledge of, and helped facilitate and conceal, the existence and purpose of BluePoint as a scheme to defraud CPA and its members."  Amended Complaint ¶ 14.  It was *ABC specifically* that formed BluePoint as a subsidiary in January 2013.  Amended Complaint ¶ 40.  When CPA raised concerns regarding BluePoint pricing on numerous occasions, it was "*personnel from both ABC and ABDC*" that "falsely assured CPA that they . . . would continue to competitively manage BluePoint pricing."  Amended Complaint ¶ 14 (emphasis added).  Throughout the scheme, ABC personnel played a leading role in both setting the fraudulently inflated BluePoint prices, *see* Amended Complaint ¶¶ 65-66, 79, and misleading CPA regarding the purpose of BluePoint and the process by which BluePoint pricing was determined.  Amended Complaint ¶ 82.  The allegations in the Amended Complaint are thus sufficient to establish that ABC was integral to the operations and management of the BluePoint Enterprise and directing its affairs.  *See Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

**V.    CPA's Claim for Breach of Contract Under Section 7(C)(6) of the 2016 CPA Agreement Is Well-Pleaded**

Finally, the Amended Complaint also pleads facts sufficient to establish that ABDC breached section 7(C)(6) of the 2016 CPA Agreement by improperly increasing ████████████ ████████. Under section 7(C)(6) of the 2016 CPA Agreement, ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████    ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████    ████████████████████    ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

CPA alleges that this purported shift did not actually occur and that ABDC's certificate is inaccurate and invalid.  Amended Complaint ¶¶ 75-77.  CPA rejects the accuracy of the certificate

50

because, among other reasons, (i) ABDC has repeatedly denied CPA's requests for information corroborating the purported shift ████████████; (ii) the declaration of a purported shift in ████████ coincided suspiciously with CPA's proposal to exclude BluePoint products from the CPA Partnership on a go forward basis, when ████████ had never, in the life of the CPA Partnership to that point, shifted downward; and (iii) the value to ABDC ████████████ ████████████ is uncannily similar to the value to CPA of Amerisource's simultaneous proposal ████████████████. Amended Complaint ¶¶ 76-77.

ABDC argues that because the Amended Complaint acknowledges the execution of the certificate, CPA in fact admits there has been no breach of section 7(C)(6). Defs.' Br. at 23-24. This argument, however, completely ignores CPA's detailed allegations as to the inaccuracy of the representations contained within the certificate. ABDC does not contend—nor can it—that a certificate *inaccurately* reporting a shift ████████ would suffice to trigger an increase in ████████████ because such an interpretation would render the requirement of a certificate absurd and meaningless. *See Clairton Slag, Inc. v. Dep't of Gen. Servs.*, 2 A.3d 765, 773 (Pa. Commw. Ct. 2010) ("A contract should not be interpreted in a way that leads to an absurdity or renders the contract ineffective to accomplish its purpose"). Here, because CPA alleges reasoned bases explaining why both that the April 5, 2018 certificate was inaccurate and that the purported shift ████████ did not actually occur, CPA has sufficiently alleged that ABDC's increase ████████████ violated section 7(C)(6) of the 2016 CPA Agreement and that ABDC is liable for the breach.

## CONCLUSION

For all the foregoing reasons, CPA respectfully requests that Defendants' motion for judgment on the pleadings be denied in its entirety.

51

**BOIES SCHILLER FLEXNER LLP**

*/s/ Philip J. Iovieno*
Nicholas A. Gravante, Jr.
575 Lexington Avenue
New York, New York 10022
Tel: (212) 446-2300
ngravante@bsfllp.com

Philip J. Iovieno
Mark A. Singer
30 South Pearl Street
Albany, New York 12207
Tel: (518) 434-0600
piovieno@bsfllp.com
msinger@bsfllp.com

Helen M. Maher
Andrew P. Steinmetz
333 Main Street
Armonk, New York 10504
Tel: (914) 749-8200
hmaher@bsfllp.com
asteinmetz@bsfllp.com

*Attorneys for Compliant Pharmacy
Alliance Cooperative*

Dated:  December 7, 2018